**SUPERIOR OFFSHORE INTERNATIONAL, INC.**

v.

**BRISTOW GROUP INC., et al.**

**Civil Action No. 1:09–CV–00438–LDD.**

United States District Court, D. Delaware.

Sept. 14, 2010.

**506**

A. Zachary Naylor, Meghan Anne Adams, Chimicles & Tikellis, LLP, Wilmington, DE, Gregory P. Hansel, Randall B. Weill, Preti Flaherty Beliveau and Pachios, Portland, ME, Wallace, K. Todd, Liskow & Lewis, New Orleans, LA, for Plaintiff.

Andre G. Bouchard, James J. Merkins, Jr., Bouchard, Margules & Friedlander, P.A., Christine S. Azar, Blank Rome LLP, Comrie Barr Flinn, Andrew Auchincloss Lundgren, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Helene D. Jaffe, Steven A. Reiss, Weil, Gotshal & Manges LLP, New York, NY, for Defendants.

## ORDER

LEGROME D. DAVIS, District Judge.

AND NOW, this 14th day of September 2010, it is hereby ORDERED that the Motion to Dismiss of Defendants Bristow Group Inc., Era Helicopters, LLC, Era Group Inc., Era Aviation, Inc., PHI, Inc., and Seacor Holdings Inc. (Doc. No. 22) is GRANTED. Accordingly, it is further ORDERED that the Complaint of Plaintiff Superior Offshore International, Inc. (Doc. No. 1) is DISMISSED.

In this putative class action, Plaintiff alleges that Defendants are liable under the Sherman Act, 15 U.S.C. § 1, which requires a "contract, combination ..., or conspiracy in restraint of trade or commerce." Defendants move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. We conclude that Plaintiff's Complaint must be dismissed because the facts pled do not plausibly allow a reasonable inference that Defendants are liable for the misconduct alleged.

## I. PROCEDURAL BACKGROUND AND FACTUAL ALLEGATIONS

Plaintiff filed its Complaint on June 12, 2009. Defendants filed the instant motion to dismiss on September 4, 2009, in lieu of answering the Complaint.

Plaintiff alleges [1] that the Gulf of Mexico is the largest oil and gas production mar-

---

**1.** These facts are taken from Plaintiff's Complaint, which on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true and view in the light most favorable to Plaintiff. *Umland v. PLANCO Fin. Servs., Inc.,* 542 F.3d 59, 64 (3d Cir.2008).

ket in the world, operating in "a 500 mile-wide area along the coasts of Alabama, Mississippi, Texas and Louisiana." (Pl.'s Compl. ¶¶ 25–26.) Plaintiff alleges that "[e]ach year, in some 2,600,000 person-trips, oil and gas workers fly to more than 5,000 offshore oil and gas platforms," and that "[i]n 2006, the helicopters logged in excess of one million hours in the Gulf." (*Id.* ¶ 26.) Plaintiff alleges that Defendants were the "largest," "dominant players" in this market for offshore helicopter services, with a combined 90% market share during the relevant period. (*Id.* ¶¶ 1, 28, 53–54.)

Plaintiff alleges that for nearly a decade from 1990 through 2000, the oil and gas industry "experienced an extended period of depressed demand and flat [stable] pricing." (*Id.* ¶¶ 29–30.) Plaintiff alleges that a downturn in oil prices in the late 1990s led to a reduction in drilling for oil and gas in the Gulf of Mexico, which decreased demand for Defendants' services and, in turn, their earnings. (*Id.* ¶¶ 44–46, 50.) Plaintiff alleges that after the terrorist attacks on September 11, 2001, there was another downturn in oil prices and production, and a consequent decrease in demand for Defendants' services. (*Id.* ¶ 47.)

Plaintiff alleges that between January 1, 2001, and December 31, 2005, Defendants conspired "to fix, raise, maintain or stabilize" the prices of helicopter services to offshore oil and gas industries in the Gulf of Mexico. (*Id.* ¶¶ 1, 27, 29–35.) Plaintiff's conspiracy claim rests on allegations of contemporaneous and uniform price increases by Defendants. Plaintiff thus alleges that Defendants, "[i]n the first half of 2001, ... implemented two across-the-board price increases totaling 30%" and that by the end of 2005, Defendants had "rais[ed] rates by approximately 50%." (*Id.* ¶¶ 30, 35.) According to Plaintiff, this conduct artificially inflated prices for Defendants' services. (*Id.* ¶ 17.)

Although Plaintiff alleges that Defendants "agreed" to implement these price increases in concert, no allegations of fact are pled that directly bear on the formation of an anti-competitive agreement. Apart from identifying a four-year period from January 1, 2001, through December 31, 2005, during which the § 1 violations allegedly occurred in the Gulf of Mexico region, Plaintiff does not state any specific time, place, or person involved in the alleged conspiracy. There are no allegations as to which of the Defendants, let alone which of their employees or officers, agreed with another to restrain competition by fixing prices, or how, when, and where any illegal agreement took place. Plaintiff makes no factual contentions that any Defendant specifically did or said something to create an understanding on pricing. Plaintiff makes no allegations of any individual's firsthand, personal knowledge of the alleged conspiracy.

In the absence of any allegations of direct evidence of an agreement or concerted action, Plaintiff necessarily supports its conspiracy claim with allegations about the circumstances surrounding the price increases and the market for helicopter services in the Gulf of Mexico during the relevant period. Plaintiff alleges these circumstances show that the helicopter-services market was vulnerable to antitrust conspiracy. (*Id.* ¶¶ 43–81.) Plaintiff further alleges that these vulnerabilities support sequential inferences that Defendants not only had opportunities and motive to conspire to fix prices, but also that they actually did so conspire and then acted as an illegal cartel. (*Id.*) As shown by the following, the pled circumstances and market conditions were publically available to all market participants.

Specifically, Plaintiff alleges that despite the decreased demand for helicopter services, a combination of market conditions

allowed Defendants not only to raise prices without losing revenue, but also to profit by doing so. Plaintiff alleges that the prices Defendants charged for their services were "highly inelastic" in the sense that Defendants could raise their prices without experiencing a concomitant reduction in sales. (*Id.* ¶¶ 59–60.) Plaintiff alleges that this inelasticity was due to the fact that there was a lack of reasonable substitutes for Defendants' services and that customers typically perceived Defendants' standardized services to be interchangeable. (*Id.* ¶¶ 61–64.)

Plaintiff also alleges that because Defendants dominated the market for offshore helicopter services during the relevant period, this "high degree of concentration" in the "insular," "close-knit" helicopter-services market, along with the high barriers that existed for potential competitors who wanted to enter this business, made it "easier to coordinate behavior among co-conspirators." (*Id.* ¶¶ 51, 78; *see also id.* ¶¶ 40, 52–58, 79–81.)

Plaintiff further alleges that Defendants had ample opportunities to conspire. Plaintiff alleges that Defendants shared a similar cost structure for helicopter-service businesses in the same geographical market, which cost information they shared through their participation in helicopter trade organizations. (*Id.* ¶¶ 65–67, 72–77.) Plaintiff alleges that various trade associations met regularly during the relevant period, "fostering the opportunities for the conspiracy." (*Id.* ¶ 68.) Based on Defendants' participation in such meetings, Plaintiff alleges Defendants did conspire to raise prices. (*Id.* ¶¶ 69–77.) Plaintiff alleges that in the helicopter-services industry, "[m]anagerial and executive level officials move[d] from one competitor to another," which "gave Defendants additional opportunities to conspire." (*Id.* ¶ 81.)

Plaintiff further supports its conspiracy claim with allegations that on June 15, 2005, the Department of Justice Antitrust Division ("DOJ"), in conjunction with a grand jury investigation concerning possible antitrust violations in the offshore helicopter-services industry, served criminal document subpoenas on some Defendants. (*Id.* ¶¶ 36–42.) Although the investigation allegedly is ongoing, it is undisputed that it has resulted in no indictments to date. Plaintiff does not otherwise plead any facts concerning the nature, scope, or status of the DOJ's investigation.

Plaintiff further supports its conspiracy claim with quotations from newspaper and media reports, (*id.* ¶¶ 33–34, 44–46, 49, 52–54), and annual Form 10–K reports filed by some Defendants with the Securities and Exchange Commission ("SEC"), (*id.* ¶¶ 32, 41–42, 50, 54), alleging that these reports support an inference of price-fixing. Most of these reports reference only the author's or speaker's views concerning the Defendants' rate increases, improved revenue and earnings, and stock prices. For example, Plaintiff alleges that Lance Bospflug, Chief Executive Officer of Defendant PHI, Inc., was quoted in December 2001 as saying that "[t]he improvement in revenue and earnings is primarily related to the implementation of rate increases in January and May of this year." (*Id.* ¶ 46, quoting *Helicopter News,* Dec. 4, 2001.) Plaintiff alleges that Peter Ricchiuti, Assistant Business Dean at Tulane University and an investment analyst, was quoted as saying that he had "never seen a [cl]earer example of bad news [decreased demand], good stock price[.]" (*Id.* ¶ 46, quoting *New Orleans City Business,* June 21, 2001.) Plaintiff alleges that Defendant Bristow Group Inc. ("Bristow") acknowledged that "[t]he disproportionate increase in revenue in relation to flight hours was primarily due to rate increases ... which went into effect in January and June

2001," and that the company would experience "continued reduction in demand for its services," given the low usage of drill rigs in the Gulf of Mexico. (*Id.* ¶ 50, quoting Bristow 10–Q for period ending Dec. 31, 2001.) Yet, it was stated that "the rate increases were the highest in Bristow's 30–year history." (*Id.*) Plaintiff alleges that in regard to the effect of decreased oil prices on providers of helicopter services in the Gulf of Mexico, another news article stated that "[s]ources interviewed agreed that it is this rate increase that has allowed the major operators to weather last year's overall slump." (*Id.* ¶ 49, quoting Bill Wagstaff, "Gulf Coast Oil Support Struggles to Keep Its Footing Amid Uncertain Times," *Aviation International News,* April 2002.)

Plaintiff alleges that one news article in particular strongly supports an inference of a price-fixing conspiracy. (*Id.* ¶ 34; *see also* Pl.'s Br., Doc. 37 at 8.) The President of Bristow was quoted as publically stating: "I'm concerned about them [new competitors] coming into the market and trying to increase their market share by putting downward pressure on rates. If they are operating out there with inadequate support, and something bad happens, it will be bad for the entire industry." (*Id.* ¶ 34, quoting *Oil and Gas Investor,* May 29, 2004.)

Plaintiff relies on another news article as an even more compelling reason to infer a price-fixing conspiracy, alleging the article confirms an admission of concerted action. (*Id.* ¶ 33; *see also* Pl.'s Br., Doc. 37 at 8, 20.) Responding to a question about the price increases, an unidentified "operator" was quoted as saying: "If we were to say that the helicopter operators all got together and agreed to these increases, that would be illegal; it would be price fixing. Let's just say that everyone more or less agreed to the necessity of a more or less equal rate hike for everyone." (*Id.*

¶ 33, quoting Bill Wagstaff, "Gulf Coast Oil Support Struggles to Keep Its Footing Amid Uncertain Times," *Aviation International News,* April 2002.)

## II. DISCUSSION

### A. *Pleading Standards for a Sherman Act § 1 Complaint*

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 does not require "detailed factual allegations," but it demands more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint is not sufficient if it offers "naked assertion[s]" without "further factual enhancement." *Id.* at 557, 127 S.Ct. 1955. A plaintiff must provide the grounds for its entitlement to relief and "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555, 127 S.Ct. 1955. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (U.S.2009). In determining whether a pleading states a plausible claim, all factual allegations must be assumed to be true; however, conclusory statements and legal conclusions are not entitled to the assumption of truth. *Id.* at 1949–50.

Applying these general standards to a § 1 claim, a well-pleaded complaint must state "enough factual matter (taken as true) to suggest that an agreement was made." *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 320 (3d Cir.2010) (citing *Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008) (quoting

*Twombly,* 550 U.S. at 556, 127 S.Ct. 1955)). Plausible grounds to infer an agreement require "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955. "Asking for plausible grounds to infer an agreement does not impose a probability requirement," but pleading facts that are "merely consistent with" a defendant's liability, "stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'" *Id.* at 556–57, 127 S.Ct. 1955.

### B. *Allegations of Parallel Business Behavior Under the Sherman Act § 1*

■ The Sherman Act § 1 "does not prohibit [all] restraints of trade … but only restraints effected by a contract, combination or conspiracy." *Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *In re Baby Food Antitrust Litig.,* 166 F.3d 112, 117 & n. 3 (3d Cir.1999) (noting that courts have interpreted these three terms together to require some sort of "concerted action"). "It does not reach conduct that is 'wholly unilateral,'" no matter the motivation. *Copperweld,* 467 U.S. at 768, 104 S.Ct. 2731 (citation omitted); *In re Ins. Brokerage,* 618 F.3d at 314 & n. 10. Section 1 claims thus always require the existence of an agreement. "To allege such an agreement between two or more persons or entities, a plaintiff must allege facts plausibly suggesting 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Howard Hess Dental Lab. Inc. v. Dentsply Int'l, Inc.,* 602 F.3d 237, 254 (3d Cir.2010) (quoting *Copperweld,* 467 U.S. at 771, 104 S.Ct. 2731 (internal quotation marks omitted)); *see In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 357 (3d Cir.2004) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775

(1984) (requiring "a conscious commitment to a common scheme")). Therefore, the "crucial question" is whether the challenged anti-competitive conduct "stem[s] from independent decision or from an agreement, tacit or express." *Theatre Enter., Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273 (1954).

■ Circumstantial evidence of parallel business conduct is probative but not sufficient to establish a proscribed anti-competitive agreement among market participants. *Theatre Enter.,* 346 U.S. at 540–41, 74 S.Ct. 257. In the absence of direct evidence of an anti-competitive agreement, evidence of parallel business conduct is ambiguous in that it may be "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly,* 550 U.S. at 554, 127 S.Ct. 1955.

For example, parallel pricing may result from illegal price fixing or instead, from lawful unilateral and independent conduct of competitors, where their decisions are interdependent:

> [I]n a market served by three large companies, each firm must know that if it reduces its price and increases its sales at the expense of its rivals, they will notice the sales loss, identify the cause, and probably respond. In short, each firm is aware of its impact upon the others. Though each may independently decide upon its own course of action, any rational decision must take into account the anticipated reaction of the other two firms. Whenever rational decision-making requires an estimate of the impact of any decision on the remaining firms and an estimate of their response, decisions are said to be "interdependent." Because of their mutual awareness, oligopolists' decisions may be

interdependent although arrived at independently.

6 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW § 1429a, at 207 (2d ed. 2003). In other words, such evidence may support both an inference of proscribed agreement and an inference of lawful conduct:

> Conscious parallelism, sometimes called oligopolistic price coordination, is described as the process not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a prefixed maximizing, supra-competitive level by recognizing their shared economic interests and output decisions.... The theory is generally applied to highly concentrated markets where few sellers exist and where they establish their prices, not by express agreement, but rather in a consciously parallel fashion.... In an oligopolistic market, meaning a market where there are a few sellers, independent parallelism can be a necessary fact of life but be the result of independent pricing decisions.

*In re Baby Food,* 166 F.3d at 122 (internal quotation marks and citations omitted); *see also In re Ins. Brokerage,* 618 F.3d at 321 & nn. 10, 19 (noting that such oligopolistic behavior or "conscious parallelism" is often adverse to consumer interests, "nonetheless [courts have] found that it is not, without more, sufficient evidence of a § 1 violation, both because it is not an agreement within the meaning of the Sherman Act, and because it is resistant to judicial remedies"); *Twombly,* 550 U.S. at 553–54, 127 S.Ct. 1955 (noting that "[e]ven 'conscious parallelism,' a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful' ") (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509

U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)).

■ Antitrust law restricts the range of acceptable inferences that may be drawn from ambiguous circumstantial evidence in order to "avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition." *In re Flat Glass,* 385 F.3d at 357; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (reaffirming that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case" in order to avoid deterring "permissible competition"). Given the ambiguity of interdependent parallel business behavior, allegations of such conduct, standing alone, are not sufficient to state a plausible contract, combination, or conspiracy in violation of the Sherman Act § 1:

> *Twombly* aligns the pleading standard with the summary judgment standard in at least one important way: Plaintiffs relying on circumstantial evidence of an agreement must make a showing at both stages (with well-pled allegations and evidence of record, respectively) of "something more than merely parallel behavior," ..., something "plausibly suggest[ive of] (not merely consistent with) agreement,".... "Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." ... Put differently, allegations of conspiracy are deficient if there are "obvious alternative explanation[s]" for the facts alleged."

*In re Ins. Brokerage,* 618 F.3d at 322–23 (footnote omitted) (quoting *Twombly,* 550 U.S. at 557, 560, 567, 127 S.Ct. 1955). As a result, the Third Circuit requires a plain-

tiff, who pleads illegal collusion based on parallel business behavior, to show certain "plus factors" that are intended to "ensure that courts punish 'concerted action'—an actual agreement—instead of the 'unilateral, independent conduct of competitors.'" *In re Flat Glass*, 385 F.3d at 360 (quoting *In re Baby Food*, 166 F.3d at 122). "In other words, the factors serve as proxies for direct evidence of an agreement." *Id.; In re Ins. Brokerage*, 618 F.3d at 323 (ruling that "plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor'").

■ Although there is no finite set or exhaustive list of such criteria, the Third Circuit has recognized three "plus factors": (1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy. *In re Flat Glass*, 385 F.3d at 360. The Third Circuit cautions that "care must be taken with the first two types of evidence, each of which may indicate simply that the defendants operate in an oligopolistic market, that is, may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism." *In re Ins. Brokerage*, 618 F.3d at 322; *In re Flat Glass*, 385 F.3d at 360–61 (acknowledging that in the context of parallel pricing in an oligopoly, "the first two factors largely restate the phenomena of interdependence," and may not suffice—by themselves—to support a claim of horizontal price-fixing by oligopolists). Thus, in a highly concentrated, interdependent oligopolistic market such as that alleged here, the third factor, "evidence implying a traditional conspiracy," becomes crucial. This factor requires allegations of "non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or

otherwise adopted a common plan even though no meetings, conversation, or exchanged documents are shown." *In re Ins. Brokerage*, 618 F.3d at 322 (citations and internal quotation marks omitted).

### C. Plaintiff Has Not Pled Facts Plausibly Suggesting an Agreement Proscribed by the Sherman Act § 1

Plaintiff sets forth no factual allegations directly bearing on the formation of an agreement to fix prices during the relevant period. Although in numerous paragraphs of its pleading, Plaintiff avers that Defendants "agreed" or "conspired" to inflate their prices, such conclusory allegations are not entitled to a presumption of truth on a motion to dismiss. Assessing a conspiracy pled under 42 U.S.C. § 1983 in light of the pleading standards set forth in *Twombly*, the Third Circuit recently instructed:

> [W]e do not consider any conclusory allegations that there was "a corrupt conspiracy," "an agreement," or "an understanding in place between the Defendants and [the alleged co-conspirators]." ... As the *Iqbal* Court clarified, "we do not reject these bald allegations on the ground that they are unrealistic or nonsensical.... It is the conclusory nature of [such] allegations" that makes them unacceptable.

*Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, No. 09–3189, 615 F.3d 159, 178 (3d Cir.2010) (quoting *Iqbal*, 129 S.Ct. at 1951).

■ Plaintiff is mistaken that the statement reportedly made by an unidentified "operator" that "everyone more or less agreed to the necessity of a more or less equal rate hike for everyone," confirms an agreement among Defendants. (Pl.'s Compl. ¶ 33.) This statement is not direct evidence of an agreement. "Direct evidence of a conspiracy, such as a document or conversation explicitly manifesting

the existence of the agreement in question [is] 'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *In re Ins. Brokerage,* 618 F.3d at 325 n. 23 (quoting *In re Baby Food,* 166 F.3d at 118); *Cosmetic Gallery, Inc.,* 495 F.3d 46, 52 (3d Cir.2007) (noting that "'[d]irect' evidence must evince with clarity a concert of illegal action"); *see, e.g., InterVest v. Bloomberg,* 340 F.3d 144, 162–63 (3d Cir.2003) (listing several examples of direct evidence of conspiracy, none of which is comparable to Plaintiff's factual allegations here); *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 468–69 (3d Cir.1998) (analyzing direct evidence of concerted action that removed any ambiguities about whether the parallel conduct in question was the result of independent or concerted action). Here, the relevance of the operator's statement as evidence of an agreement requires multiple speculative inferences: that the operator was an employee of one of the Defendants, that the operator was in a position to participate in that Defendant's pricing decisions and did so participate, and that the reporter correctly quoted the operator. The operator has not been identified and his statement has not been verified.

Moreover, the relevance of the operator's statement as circumstantial evidence of an agreement is dubious. Even taking the operator's reported words for the truth, his statement is ambiguous as to whether he comments on the industry's lawful but interdependent pricing decisions; casual observations about the general convergence of prices among unnamed market participants at that time; or perhaps an illegal agreement by unnamed actors at some unspecified point in time. Plaintiff does not plead which of the Defendants supposedly agreed with another to restrain competition by fixing prices, or how, when, and where the illegal agreement took place. Instead, Plaintiff throws a blanket charge of conspiracy over all Defendants based on their parallel price increases, implying that each conspired to fix prices.[2]

Plaintiff's charge of conspiracy among Defendants rests entirely on inferences to be drawn from alleged economic and other non-economic circumstances. The question thus becomes whether Plaintiff has alleged sufficient factual content that would justify a reasonable inference that any Defendant illegally agreed with one or more other Defendants, making any such Defendants liable for the misconduct alleged.

■ Plaintiff alleges economic circumstances amounting to a textbook example of an industry that is vulnerable to efforts to implement and maintain supracompetitive prices. Plaintiff thus alleges that the market for helicopter services in the Gulf of Mexico is a highly concentrated, interdependent oligopoly in which Defendants were the "dominant players" holding a combined 90% market share. Plaintiff alleges that this market gave Defendants a motive to conspire, afforded them ample opportunities to conspire under cover of legitimate business and pro-

---

**2.** In its Complaint, Plaintiff defines Defendants Era Group Inc., Era Helicopters, LLC, Era Aviation, Inc., and Seacor Holdings Inc. to be one defendant party designated as "Era." (Pl.'s Compl. ¶ 10.) Seacor Holdings Inc. ("Seacor") objects to this technique, contending that Plaintiff improperly blurs Defendants' separate corporate identities and their potential liabilities. (*See* Def.'s Br., Doc. No. 31.) Seacor also asserts that in July 2005, it sold Era Aviation, Inc., which is no longer an affiliate of Seacor, Era Group Inc. or Era Helicopters, LLC. (*Id.* at 6 n. 1.) Seacor further asserts that Era Helicopters, LLC is a wholly-owned subsidiary of Era Group Inc., which is a wholly-owned subsidiary of Seacor. (*Id.*) We need not reach Seacor's arguments because we conclude that Plaintiff has not adequately alleged an illegal agreement between or among any Defendants.

fessional pursuits, and allowed them to consciously share information with their co-competitors, all of which allegedly resulted in Defendants acting against their rational, economic self-interest by inflating prices during a downturn in demand for helicopter services. None of Plaintiff's allegations, taken singly or together, justifies an inference of conspiracy or states a plausible claim of price fixing.

The alleged parallel conduct—setting prices at the same level—is probative and consistent with the existence of an agreement among Defendants, but it is not sufficient to establish a proscribed anti-competitive agreement. In a highly concentrated, interdependent market such as that alleged here, the alleged price coordination among the few defending sellers might be the result of an understanding among the sellers to fix prices or it equally might be the result of each seller's lawful independent pricing decisions. Plaintiff thus must establish at least one "plus factor" to state a plausible conspiracy claim. As shown below, Plaintiff fails to do so.

Plaintiff's allegations of Defendants' conspiratorial motives and pricing decisions that were purportedly against each firm's self-interest amount to allegations of Defendants' interdependent conduct. Plaintiff alleges that Defendants' prices for helicopter services uniformly increased in a parallel fashion during a period of decreased demand, concluding that the in-creases must have resulted from Defendants' illegal agreement because the increases make no economic sense when viewed from the perspective of an ideally competitive market.[3] Even assuming that there was a downturn in demand and Defendants increased their prices in a parallel fashion, these allegations do not support an inference of an agreement to fix prices. As the Third Circuit instructed, in a market where there are a few dominant sellers, and where each seller's pricing decision is interdependent on the decisions of its rivals, each seller may have a business motive to coordinate parallel pricing in order to maximize its own business goals:

> [I]t is quite likely that oligopolists acting independently might sell at the same above-marginal cost price as their competitors because the firms are interdependent and competitors would match any price cut. Therefore, they quickly learn that price cuts do not increase market share and go back to their non-competitive pricing. Accordingly, Areeda warns courts not to consider a failure to cut prices or an initiation of a price rise as an action against self-interest because it also reflects the interdependence of the industry.

*Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.,* 998 F.2d 1224, 1244 (3d Cir.1993); *see also* Areeda, *supra,* ¶ 1434c1, at 244–45.[4] There is nothing ir-

---

3. Specifically, Plaintiff alleges:

When prices increase substantially during a slump, normal economic behavior cannot provide a rational explanation. After the initial price increases [in 2001], economic factors that would ordinarily have led to lower prices in a competitive market [decreased demand] continued to affect the industry.... When business is declining, enlightened self-interest would normally cause a rational economic actor to reduce prices in order to attract more business. Raising prices when demand is low would

normally be contrary to the self-interest of an operator seeking to increase market share or garner new customers or increased sales to existing customers.

(Pl.'s Compl. ¶¶ 47, 48.)

4. Areeda explained that in an oligopoly, "conspiratorial motivation" and "acts against self-interest" often say nothing more than the sellers' decisions are "interdependent," in the sense that the profitability of one seller's decision depends on the decisions of its rivals:

[A] price rise cannot be maintained unless rivals follow. The firm that believes that its

rational or self-defeating about the alleged parallel pricing in an oligopolistic market in which enlightened economic actors may independently and unilaterally choose to adopt and maintain supra-competitive pricing in order to increase industry profits during a downturn in demand, or at least decrease losses, thereby improving each firm's profits or financial footing in the market. Plaintiff's only allegations of acts against each Defendant's economic self-interest are allegations of Defendants' parallel price increases during a period of decreased demand. Plaintiff makes no other allegations that Defendants acted against their self-interest in ways not attributable to interdependence.

Plaintiff quotes a number of newspaper and trade media reports, and portions of mandatory SEC reports filed by Defendants, alleging that these reports support an inference of price-fixing. Even assuming the veracity of the facts reported about Defendants' alleged rate increases, improved revenue and earnings, and stock prices, those facts do not tend to exclude the possibility that Defendants acted independently. The reported facts are consistent with lawful, interdependent business behavior among oligopolists.

Similarly, Plaintiff is mistaken that the reported statement by Bristow's President strongly supports a price-fixing conspiracy. No anti-competitive inferences can be drawn from his reported concern "about [new competitors] coming into the market and trying to increase their market share by putting downward pressure on rates." (Pl.'s Compl. ¶ 34.) It is entirely lawful to compete. *See Matsushita*, 475 U.S. at 594, 106 S.Ct. 1348 (noting that "cutting prices in order to increase business is the very essence of competition"). Also, no reasonable inference of an agreement can be drawn from his reported concern about new entrants coming into the market and "operating out there with inadequate support, and something bad happens, it will be bad for the entire industry." (Pl.'s Compl. ¶ 34.) There is nothing in the statement that indicates any discussion or collusion among Defendants. Moreover, no reasonable inference can be drawn from this statement of a warning or threat to deter potential entrants from coming into the market. *But see Rossi*, 156 F.3d at 468 (holding that a rival's threat indicated an anti-competitive agreement, where it was stated that the rival and other named competitors "would do anything they could ... whatever they had to do they were going to do to keep [the plaintiff] out of business"). Rather, his statement can fairly be read as a concern about potential price-cutting entrants that might operate on a shoestring with "inadequate support" for their operations, implying that pricing below a certain level would require entrants to forego earnings that might be needed for adequate equipment, maintenance, and personnel, at the expense of the industry's reputation for safety in the event of a

profits, and rivals' profits, could be increased by raising prices has a motive to reach advance agreement with its rivals. Conspiratorial motivation in the sense of a reasonable prospect of increasing profits through collective action is a logical corollary of interdependence. With interdependence, rivals can maximize industry profits by coordinating their prices; anticompetitive results can be achieved through common action. Motivation is thus synonymous with interdependence and therefore adds nothing to it.

"Action against self-interest" is also ambiguous. One meaning merely restates interdependence: an act that would be against self-interest (failing to reduce price to expand market share) defined without regard to rivals' responses (similar reductions depressing industry profits) or against self-interest (initiating price rise) unless rivals do the same (follow the leader). In this usage, self-interest merely restates interdependence and adds nothing to it.
Areeda, *supra*, ¶ 1434c1, at 244–45 (footnotes omitted).

serious accident. None of these statements tends to exclude the possibility that Defendants independently priced their services.

Plaintiff's Complaint is devoid of any factual allegations that would allow an inference of a traditional conspiratorial agreement. Plaintiff alleges Defendants had numerous opportunities to conspire at regularly convened trade-association meetings, through their employment of various managers and executives from one helicopter-service firm to another competitor, and in their socializing in a small Louisiana community "in an atmosphere of informal cooperation and mutual interests in the industry." (Pl.'s Compl. ¶¶ 79–80.) Nonetheless, " '[p]roof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place.' " *Petruzzi's*, 998 F.2d at 1235, 1242 n. 15 (noting that evidence of social calls and telephone contacts among the defendants' representatives was insufficient to exclude the possibility that defendants acted independently); *see also In re Baby Food*, 166 F.3d at 133–34 (agreeing with the district court that evidence of "chit chat" at chance meetings or trade shows among persons with no pricing authority should be given little, if any weight, because "[c]ompany personnel do not often operate in a vacuum or 'plastic bubble'; they sometimes engage in the long-standing tradition of social discourse"). Plaintiff's allegations concerning Defendants' opportunities to conspire thus do not permit a reasonable inference of collusion.

Plaintiff alleges that Defendants openly shared information about their capacity to serve the oil and gas producers, and the costs Defendants commonly faced for fuel, helicopters, support facilities, personnel, and maintenance. Plaintiff makes no allegation of any specific concerted exchange of pricing information between or among Defendants. Defendants' alleged knowledge of their co-competitors' cost structures, and the competitors' "unfettered" exchange of business information, are neither remarkable nor actionable. (Pl.'s Compl. ¶ 72.) Such exchanges among rivals "can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *In re Baby Food*, 166 F.3d at 118, 123, 125–26 (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)). The Third Circuit has clearly ruled that "communications between competitors do not permit an inference of an agreement to fix prices unless 'those communications rise to the level of an agreement, tacit or otherwise.' " *Id.* at 126 (quoting *Alvord–Polk, Inc. v. Schumacher & Co.*, 37 F.3d 996, 1013 (3d Cir. 1994)). Plaintiff alleges only non-actionable exchanges of information, setting forth no facts permitting an inference that the data shared had any impact on pricing decisions.

Plaintiff attempts to bolster its conspiracy theory with allegations that on June 15, 2005, the DOJ served document subpoenas on some Defendants in connection with an investigation of possible antitrust violations among helicopter-service providers in the Gulf of Mexico. Plaintiff provides no other facts about the DOJ's investigation. Although Plaintiff also alleges some Defendants made public announcements and filed mandatory SEC Form 10–K disclosures about the investigation, these reports add no additional facts. (*See* Pl.'s Compl. ¶¶ 41–42.) Rather, Defendants reported their opinions and predictions about the material risks and impact of the DOJ's investigation. Plaintiff concludes that some Defendants "have acknowledged that they are targets of this antitrust investigation" (Pl.'s Br., Doc. 37 at 13), but this is not supported by the Complaint's well-pleaded facts. (*See* Pl.'s Compl. ¶¶ 41–42.)

Even assuming the veracity of the facts alleged in these reports, they are not probative of the existence of an illegal agreement or concerted action by Defendants. They do not permit a reasonable inference that any Defendant committed an antitrust violation because proof of the mere occurrence of the DOJ's investigation is equally consistent with Defendants' innocence. *See, e.g., In re Graphics Processing Units Antitrust Litig.*, 527 F.Supp.2d 1011, 1024 (N.D.Cal.2007) (holding that subpoenas served on the defendants and a grand jury investigation carry no weight in pleading an antitrust conspiracy where it is unknown whether the investigation will result in indictments or nothing at all); *In re Tableware Antitrust Litig.*, 363 F.Supp.2d 1203, 1205 (N.D.Cal.2005) (rejecting the significance plaintiffs attached to an investigation because "[s]imply saying 'me too' after a governmental investigation does not state a claim"). Thus, the initiation of the DOJ's investigation and Defendants' receipt of document subpoenas, coupled with reports by some Defendants of their opinions and predictions about the financial impact of the investigation, do not enhance the plausibility of Plaintiff's claim and do not warrant subjecting Defendants to the burdens of antitrust discovery.

## III. CONCLUSION

Although Plaintiff pleads that Defendants illegally agreed to raise prices in restraint of trade, this conclusion rests largely on descriptions of Defendants' parallel conduct, not on any allegations of an actual agreement. Although some stray statements conceivably speak of an illegal agreement, they also imply lawful conduct. Because Defendants' alleged parallel price coordination is equally consistent with legal and illegal conduct, the Complaint is insufficient to allege a conspiracy. *See, e.g., Hess,* 602 F.3d at 256 (affirming dismissal of § 1 claims where the allegations did not offer "even a gossamer inference of any degree of coordination" among the defendants and did "no more than intimate 'merely parallel conduct that could just as well be independent action'" (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955)). As the Third Circuit has instructed, "lawful parallel conduct fails to bespeak unlawful agreement. . . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955.

Plaintiff's claim of conspiracy stops short of the line between possibility and plausibility of entitlement to relief. There are not enough facts alleged to suggest that an illegal agreement was made, or to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

Accordingly, it is ORDERED that Defendants' Motion to Dismiss is granted as to all Defendants. The Clerk of Court is directed to close this matter for statistical purposes.